## FISCHER & PORTER COMPANY

v.

## LIBERTY MUTUAL INSURANCE COMPANY.

### Civ. A. No. 83–0832.

United States District Court,
E.D. Pennsylvania.

Dec. 5, 1986.

Robert H. Malis, Philadelphia, Pa., for plaintiff.

## MEMORANDUM

GILES, District Judge.

For the reasons which follow, summary judgment will be granted in favor of the insurer, Liberty Mutual Insurance Company, and against the insured, Fischer & Porter Company. Plaintiff has failed to adduce evidence from which a reasonable juror could find that there was a "sudden and accidental" pollution occurrence under the terms of the insurance policy in question. For the same reasons, the cross-motion of Fischer & Porter for partial summary judgment must be denied.

1. Fischer & Porter Company brought this declaratory judgment action against Liberty Mutual Insurance Company seeking reimbursement of those costs it incurred in cleaning up groundwater pollution attributed by the United States Environmental Protection Agency ("EPA") to the Fischer & Porter site at County Line and Jacksonville Roads in Warminster

Township, Bucks County, Pennsylvania. Fischer & Porter now seeks indemnity under a comprehensive general liability insurance policy.

2. In October, 1980, the EPA initiated legal action against Fischer & Porter to clean up groundwater under and near its Warminster property, alleging that the property owner was responsible for contamination of the water by the chemical known as Trichloroethylene ("TCE"). *U.S. v. Fischer & Porter Company*, E.D.Pa., No. 80–3900 (E.D.Pa.1980). The EPA charged that the source of the TCE contamination was the Fischer & Porter site. Fischer and Porter denied the allegation, contending that the source of contamination could have been from surrounding properties. However, without admitting liability for the contamination found under its property, it settled the EPA action by a Consent Decree which allowed for the purification of well and groundwater on its property and in acquifers which service the municipal water systems of Hatboro and Warminster Townships. The Consent Decree was entered of record November 4, 1984.

3. In this declaratory judgment action, Liberty Mutual has moved for summary judgment, following the completion of discovery, contending that there is no evidence discovered, or to be adduced, which would show that under the terms of the policy of insurance there was an "occurrence", an occurrence that was "sudden and accidental" or "damage."

4. Fischer & Porter has answered the summary judgment motion by contending that Liberty Mutual waived any argument that there was no "occurrence" since it afforded a defense under the policy to Fischer & Porter in the EPA action, thereby conceding that there had been an "occurrence." It further contends that Liberty Mutual waived the "lack of occurrence" argument when, in response to Fischer & Porter's demand for defense and indemnification, Liberty Mutual wrote by letter of March 24, 1981,

Please let this serve as formal notice that Liberty Mutual Insurance will defend and indemnify you for the above-captioned suit under the terms of your policies ... This is based on the complaint and allegations as they stand now. If a final outcome of the case shows that the pollution was *not* sudden and accidental, but rather arose out of a longstanding discharge of pollutants, then there will be no coverage under the policy.

(Appendix to Plaintiff's Response and Cross-Motion, A–64). Because the letter allegedly did not specifically contend that there had been no "occurrence," plaintiff argues that there was a promise to indemnify unless it was shown that the occurrence was sudden and accidental.

Fischer & Porter contends that there was an "occurrence," in any event, because the TCE contamination was found in the groundwater under its property and its supervisors would testify that they knew of no intentional deliberate dumping of TCE and the resulting damage was not expected or intended.

It submits that the pollution exclusion in the policy for other than sudden and accidental pollution occurrences is ambiguous and that Liberty Mutual bears the burden of proving that the TCE contamination did not occur by sudden and accidental means and that Liberty Mutual cannot carry that burden.

Based upon these arguments, and affidavit evidence, Fischer & Porter sought summary judgment in its favor by way of a cross-motion.

■ 5. Fischer & Porter's contention that there was a waiver of the "no occurrence" defense is frivolous and must be denied. Affording a defense to an insured does not constitute an admission that there is underlying claim liability. Here, Liberty Mutual's March 24, 1981 letter advised the insured that it would indemnify "under the terms of [the] policies", provided the allegations in the EPA Complaint were true, that is, that there was a determination that Fischer & Porter was the source of the TCE contamination and that the pollution was not "sudden and accidental." The requirement that the insured show that there

was an "occurrence" is one of the terms and conditions of policy coverage.

6. In the policy "occurrence" is defined as "... an accident, including continuous or repeated exposure to conditions which results in bodily injury, or property damage neither expected nor intended from the standpoint of the insured."

7. Fischer & Porter does not admit that there was any event which occurred in its facilities or operations that accounts for the TCE contamination as found by the EPA. In the EPA action it denied that it was the source of the pollution. Its position in this declaratory judgment action is that because the TCE contamination was found in its soil and the groundwater contiguous to its site that it may be presumed that the pollution that it undertook to clean up did, in fact, emanate from its operations. Therefore, it argues, there was accidental pollution for which it could be held liable. Further, it contends that because its supervisory and managerial witnesses would testify that they were unaware of any deviation by employees from established procedures for the safe use and handling of TCE, when delivered to the site and during use and disposal, any spillage had to have been unintended and unexpected; no spillage was authorized or intentionally permitted by management. Because the pollution was claimed by the EPA and the Hatboro Township to cause damage to the municipal water system and to the wells of adjoining property owners, Fischer & Porter argues that all the criteria have been met for proof of an "occurrence" as that term is defined in the policy.

8. On the other hand, Liberty Mutual contends that the evidence it discovered of Fischer & Porter's operations and continuous "sloppy housekeeping" of TCE explains the TCE contamination in the places and at the pollution levels found by the EPA. These failures to follow safe procedures for the use and disposal of TCE establish, it submits, that the discovered pollution was not unexpected, but was the predictable result of regular business activities. It charges that Fischer & Porter knew or should have known what was oc-

curring with the TCE usage in its plant and permitted the "sloppy housekeeping" and disregard for, or lack of supervision of, safe means and methods of TCE handling.

9. "Occurrence" is defined under the policy as "physical injury to or destruction of tangible property or the loss of use of tangible property which has not been physically injured or destroyed ...". Liberty Mutual contends that the relief accorded under the Consent Decree is all injunctive and is not covered under the policy. The Consent Decree requires Fischer & Porter to take remedial steps to isolate and treat groundwater under its site through aeration processes at wells on its property to reduce the TCE and PCE contamination to levels acceptable to the EPA, to adhere to specified plans for storage, handling treatment and disposal of TCE and other chemical containers, to install a groundwater recovery system and to monitor that system to insure that the contamination levels are being decreased. The Consent Decree also provides that Fischer & Porter contribute funds to the Hatboro Borough Authority and the Warminster Heights Water Authority to enable them to purchase and operate necessary water purification equipment to filter, aerate, or otherwise treat the water before it enters the public drinking water systems.

10. Under Fed.R.Civ.P. 56, the movant has the initial burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits demonstrate an absence of a genuine issue of material fact. It is not the movant's responsibility to file supporting materials which negate the nonmovant's claim. *Celotex Corp. v. Catrett,* — U.S. —, 106 S. Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). However, the movant must demonstrate that the non-moving party has failed to establish the existence of an element essential to his case. *Id.* A party resisting a motion cannot rely upon bare assertions, conclusory allegations or suspicions. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982). The non-moving party must establish by affidavit or other affirmative evidence each

element of his case upon which he will bear the burden of proof at trial. *Id.* at 2552.

11. Fischer & Porter bears the burden of showing that there was an "occurrence", that is, that there was an accident which resulted in property damage which was neither expected nor intended from the standpoint of the insured.

12. Fischer & Porter denied that there was any accident or event in its operations which accounted for the levels of TCE contamination in the groundwater found by the EPA under and surrounding the facility. The mere presence of the TCE contamination in the groundwater does not automatically pinpoint Fischer & Porter as the source. At trial, it would *not* undertake to prove that it was responsible for the contamination. For this reason, alone, Liberty Mutual's motion must be granted.

13. After the close of discovery, Fischer & Porter suggested that its underground TCE storage tank could have been the cause of the contamination because when it was removed from the ground in 1984 it was leaking water. Upon motion of Liberty Mutual, the court precluded the "suggestion" because Fischer & Porter took the position that it did not contend, and would not attempt to prove at trial, that the storage tank had been leaking prior to 1980. In 1980, the TCE was stored in a tank atop the plant facility and the underground tank was filled with water.

14. Fischer & Porter had consistently maintained throughout this case and the EPA litigation that its storage tank had not leaked according to its expert's reports. After completion of discovery, it changed experts and the newly retained expert interpreted the data on the tank's integrity as of 1979 as being as consistent with it not leaking as with it leaking.

15. Since Fischer & Porter did not assert that the new expert's interpretations supported a conclusion that the underground storage tank had been leaking in and prior to 1980 (the TCE was first stored in an above ground tank in 1980), the suggested "leaking" evidence was stricken as not capable of meeting a "preponderance of the evidence" test.

16. Even if allowed, the suggested leaking tank evidence could not have proven an "occurrence" within the meaning of the policy. The underground storage tank was made of cast iron and, when installed in 1949, had a useful life of twenty years. Therefore, Fischer & Porter should have expected that the tank could start to leak at anytime after 1969. It chose to monitor the tank periodically to assure itself that there was no leak. However, the nonremoval of the tank after its useful life was an acceptance by Fischer & Porter of the risk that the tank would leak TCE into the groundwater. If the tank leaked after 1969 the leakage would not have been accidental and the resulting damage to the environment would have been expectable.

17. Fischer & Porter has offered no explanation for leaving the tank in the ground beyond its useful life except that regular monitoring convinced it that the tank was intact and not leaking. The accepted risk included the possibility that its monitoring experts would misinterpret the tank integrity data.

18. Consequently, Fischer & Porter has produced no evidence of an accidental spillage of TCE product, while Liberty Mutual has proffered concrete evidence which its experts contend explains the level of TCE contamination found by the EPA and confirms that Fischer & Porter was the source.

19. That evidence, largely from former plant workers, is unrebutted and establishes that the causative spillage was part of the regular conduct of the insured's business operations.

20. Fischer & Porter's mere contention that these former employees' testimony as to the routine of TCE disposal might not be believed by the jury is not sufficient to defeat a properly supported motion for summary judgment. *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984); *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

21. Paragraph numbers 22–38 are unrebutted factual allegations advanced by Liberty Mutual.

22. Fischer & Porter began using TCE as a degreasing agent in or about 1946. TCE is delivered by truck to the facility and is pumped into a storage tank on the premises. Until 1980 the storage was underground. In 1980, the storage was begun in a roof top tank. Although storage in the underground tank was discontinued, it was not removed until 1984, having been filled with water in 1980.

23. Until 1979, Fischer & Porter purchased approximately 12,000 to 16,500 gallons of TCE per year. Its records, however, account for only approximately 3,000 to 5,200 gallons of spent TCE per year returned through the Chemclene Company, which was responsible for disposal.

24. From 1980 through 1984 Fischer & Porter purchased approximately 2,500 to 7,200 gallons of TCE yearly but returned approximately only 935 to 3,500 gallons yearly to Chemclene.

25. Fischer & Porter uses TCE and 1,1,1 TCE, another solvent, as degreasers to clean metal and glass products and parts, tools and machinery.

26. The TCE is pumped from the storage tank through the scrap metal room. Between 1963 and 1971 employees drew TCE from the supply pipe for use in cleaning tools.

27. Prior to the EPA inspection, Fischer & Porter did not have in place or did not enforce non-spill and clean-up rules regarding TCE. Items to be degreased were lowered into a tank containing boiling TCE, held there for a time and then removed. TCE could be dragged out of the tank in holes of part or the pallet which held the part.

28. Attached to the main degreaser is a wand which is used to spray TCE on parts being cleaned. The wand has been used by employees to fill buckets with TCE for use at their drill presses or lathes or for other purposes.

29. 1,1,1 TCE is a cold degreaser which was used extensively by drill press operators who obtained it in buckets from nearby 55 gallon drums. Access was not limited prior to the EPA inspection and employees did not account for the use of it. 1,1,1 TCE was poured on the drill press and lathe machines from time to time and when it was not available buckets of TCE were used. TCE and 1,1,1 TCE would drip into the oil reservoirs of the machines and mix with the oil. Management claimed not to be aware of these practices.

30. No one in management was in charge of seeing that hazardous waste materials were cleaned up if spilled in the plant or to monitor the storage of toxic materials. Spills were left to evaporate, or if cleaned up, the solvent soaked rags were dumped into ordinary trash containers which were later emptied into a trash compactor outside the scrap metal room.

31. The vapor degreasers are cleaned regularly. The spent TCE is pumped into 55 gallon drums and stored in the scrap metal room for later pick up by Chemclene. Sludge from the bottom of the degreaser tank, has been deposited in the trash compactor.

32. Drill press operators have over the years poured buckets of spent TCE and 1,1,1 TCE down a drain in the drill press area, into a nearby sink, into floordrains located in the scrap metal room, and into drains outside the scrap room. These drains either empty into storm or sanitary sewers or empty directly into the ground. In 1980 Liberty Mutual's experts found that 80% of the sanitary sewer line joints into which Fischer & Porter's sewage is discharged were faulty so as to allow contaminants to leak into the ground. This method of solvent disposal was known to be improper but was either permitted intentionally or through lack of supervision and training of employees.

33. Used oil containing TCE and 1,1,1 TCE is routinely poured into a trench in the scrap room. Into the same trench is drained used oil from 55 gallon drums of metal cuttings. The oil drained from the trench into a waste oil tank under the scrap room floor. When a trench is cleaned the sludge shoveled out is dumped into the

trash compactor. As late as August 1984, TCE and PCE chemicals were found beneath and on the paved area around the compactor. The paved area beneath the compactor was cracked, broken and generally in a condition which would allow TCE, PCE and 1,1,1 TCE to migrate into the soil below the Fischer & Porter site and into the groundwater.

34. Fischer & Porter maintains that it knew of, and authorized, TCE use only in its vapor degreaser operations and had no knowledge of spent solvent disposal in sinks, drains or the scrap room trench. Employees testified, however, that this had been a long standing practice, at least since 1963.

35. The trash compactor drains into a 110 gallon capacity manhole which was found by Liberty Mutual's experts to contain a mixture of oil and water and to be filled almost to overflowing. Stains showed that it had been allowed to overflow in the past. It was contaminated with TCE.

36. The waste oil tank into which waste from the scrap room trench drains was found to be contaminated with TCE and PCE. Evidence of both compounds was also found in a sample scraped from the stained wall under the waste oil cap. In August, 1984 a shallow soil sample, collected next to the scraproom near the waste oil tank access pipe cap, showed a black oily liquid. The soil sample contained six chlorinated solvents including PCE.

37. In June 1985, in an area northwest of the Colburn Lab a small pipe was found discharging water onto the ground. Shallow soil samples were taken in the area of the discharge. A strong fuel oil smell was observed during the drilling. The samples showed traces of TCE and 1,1,1 TCE. Fischer & Porter stored 1,1,1 TCE at the Colburn Lab. Benzene was detected in the shallow soil sample. Its presence, along with TCE and 1,1,1 TCE, indicate multiple separate spills of chlorinated solvents and fuel oils since benzene is not used also with the solvents. The defendant's expert concluded that past and continuing discharges

from the pipe could account for the contaminants in the soil.

38. Liberty Mutual's experts concluded from their survey Appendix, Defendant's Motion for Summary Judgment (A106):

The plot of contaminants in the groundwater against time makes it clear that a series of discrete discharges of contaminants has occurred since 1979. Deposition testimony indicates that contaminant releases had occurred for a number of years prior to 1979. Between these discharges, purging of the wells reduces the level of TCE in the groundwater to approximately 1 ppm or less. This 'background' TCE level could be from several sources. One source could be the desorption of TCE from the aquifer materials saturated during a previous discharge. Also, the disposal of enlorinated solvents to the sanitary sewer drains could be a fairly constant source of contamination, since the sewer survey showed that most of the joints in the sewer are not leak-proof. A third possible source is slow leakage through concrete floors within the plant. A one-time surface spill of a large quantity of contaminant has been ruled out, since such a spill would have been immediately noticed and because F & P has denied that such a spill has occurred. Based on the available information discussed in this report, it is E & E's opinion, to a reasonable degree of certainty, that the sources of the separate "events" indicated in the time versus contaminant concentration plot are the result of drum rupture and/or chlorinated solvent spillage in the drum storage area; release of contaminants from the compactor waste, especially during heavy precipitation or compaction; and/or spillage of waste oil. It is further E & E's opinion, to a reasonable degree of certainty, that all of these releases have resulted from F & P's past and continuing improper storage, handling, and disposal of hazardous materials.

39. Fischer & Porter contends that if the TCE contamination originated in its facility as is claimed by Liberty Mutual, then the pollution was an accident, and the

resulting physical damage to the environment was not expected or intended. Alternatively, it maintains that there is a material issue of fact whether the pollution was an "occurrence" within the meaning of the policy.

40. The Fischer & Porter site contamination either is the source of the TCE for possible insurance coverage purposes or it is not. If not, then, the insurance policy is not implicated. Assuming Fischer & Porter's site is the source and the means of that pollution was employees' dumping and use of TCE in the ways described by Liberty Mutual, then the pollution resulted from voluntary acts within the regular, routine business operations of the insured and was not accidental.

41. Fischer & Porter does not deny the unlawful usages and means of disposing of TCE described by some of its former drill press and lathe operators as being within their normal course duties. It maintains that if the practices occurred they were not authorized and were unknown to supervision. Such employees did not follow established rules prohibiting the use and dispensing of TCE. It follows, necessarily, that if there were practices which were not discovered, Fischer & Porter did not closely supervise the employees or enforce existing rules. (A–596).

42. At their depositions, some employees testified that they were told by their leadmen or working supervisor about the use of TCE as a machine degreaser and coolant. The TCE was obtained regularly from 55 gallon drums near the supervisor's office or from the tool room (Defendant's Appendix to Motion for Summary Judgment, A–596) and a requisition process for obtaining the TCE was not enforced. When used as a coolant, it evaporated rapidly. Because so much of it was used during a day it was not feasible to fill out a slip each time an additional TCE was needed. (*Id.*, A–492–493).

43. The use was throughout the drill press and lathe departments which ran three shifts. The drill press department alone had fifty machines (*Id.*, A–597). Spent TCE degreaser was poured down a drain in the floor of the plant when it got dirty or the color of tea. (*Id.*, A–544–546, 559).

44. The deposition testimony of the former employee witnesses presented by Liberty Mutual is uncontradicted as to the standard operating procedures with TCE and 1,1,1 TCE. The insured takes the position that these former employees were discharged and have motives to lie. However, Fischer & Porter has not produced any evidence to show that their recollections are not accurate or that there was no practice as is contended. No testimony has been offered by Fischer & Porter from any drill press operator, lathe operator, leadman or tool room, or TCE dispenser, former or present, contradicting Liberty Mutual's proffered testimony.

45. According to the Liberty Mutual evidence, the described use was a common practice among these categories of employees.

46. The disposal of the TCE contaminants in an unlawful manner, occurring as part of the regular course of business activity is not accidental. *Great Lakes Container Corp. v. National Union Fire Ins. Co.*, 727 F.2d 30, 33–34 (1st Cir.1984) (insured in reconditioning barrels routinely emptied the contents of used barrels and rinsed residue onto the ground and caused leaching of pollutants into groundwater). *American States Ins. Co. v. Maryland Casualty Co.*, 587 F.Supp. 1549, 1552–1553 (E.D.Mich.1984) (construing Liberty Mutual's pollution exclusion clause to apply to intentional continuous dumping of toxic wastes at sites and where there was no suggestion by polluter that pollution was accidental).

47. The pollution exclusion clause of the Liberty Mutual policy is not ambiguous. It reads:

The policy does not apply to ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon

**140**

land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental....* (emphasis added).

48. Contamination that results from continuous dumping of toxic chemicals into drains or into compactors or tanks that would, in turn, spill into drains or onto the ground is not sudden, even if one could argue that the spillage was accidental or the resulting damage unexpected. *Techalloy Co. v. Reliance Ins. Co.*, 487 A.2d 820, (Pa.Super.1984) (find "sudden and accidental" phrase in insurance policy unambiguous and applicable to preclude a claim based upon allegations of regular or sporadic discharge of TCE and non-sudden contamination of water).

49. The burden of proving that claim comes within the coverage provisions of the policy fall upon the insured. *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1308 (3d Cir.1978).

50. The burden of proving a defense, or an exception to coverage, is upon the insurer. However, "sudden and accidental" is an aspect of *coverage*, which is Fischer & Porter's burden to prove. Liberty Mutual would have the burden of proving that a contamination asserted by the insured to be "sudden and accidental" was "other than sudden and accidental" but would not have the burden of proving both coverage and the defense.

51. "... when a policy contains an exception within an exception, the insurer need not negative the internal exception; rather the insured must show that the exception from the exemption from liability applies." 19 G. Couch, *Couch On Insurance 2d* § 79.385, at 338.

52. Even if Fischer & Porter could prove that there was accidental pollution, it has not averred or undertaken to prove that there was a causative sudden event or series of events. The plain, ordinary meaning of the word "sudden" signifies an event that ocurs abruptly, without warning. *Webster's New Collegiate Dictionary* 155 (1978 Edition). Employee practices, attrib-

uted to management, of pouring contaminants into floor drains or into other areas which caused leaching into the groundwater are not "sudden and accidental" events. *Techalloy Co. v. Reliance Insurance Co.*, 487 A.2d 820 (Pa.Super.1984).

For these reasons, summary judgment must be granted in favor of defendant Liberty Mutual and against plaintiff, Fischer & Porter, dismissing the complaint.