**GOULD, INC., Plaintiff,**

**v.**

**CNA, et al., Defendants.**

**No. 3: CV 91–0569.**

United States District Court,
M.D. Pennsylvania.

Aug. 28, 1992.

John E. McKeever, Dennis R. Suplee, Diana S. Donaldson, Susan G. Caughlan, Schnader, Harrison, Segal & Lewis, Stacy J. Levitan, Philadelphia, PA, for plaintiff.

Stephen C. Baker, Samuel J. Arena, Jr., Stradley, Ronon, Stevens & Young, Wayne, PA, William J. Barker, Jr., Samuel J. Arena, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, PA, for defendants CNA, Continental Cas. Co. and Transp. Ins. Co.

Michael F. O'Neill, Purcell Ries Shannon & Mulcahy, Bedminster, NJ, for defendant Hartford Fire Ins. Co.

Mariola K. Weithers, Regina K. McCabe, Terry M. Cosgrove, Chicago, IL, Jacob I.

**330**

Nogi, Nogi, Appleton, Weinberger & Wren, P.C., Scranton, PA, for defendants Walbrook Ins. Co. Ltd., Winterthur Swiss Ins. Co., Bermuda Fire & Marine Ins. Co. Ltd., Compagnie Europeenne D'Assurances Industrielles S.A., St. Katherine Ins. Co. Ltd., C.N.A. Reinsurance of London, Ltd., British Nat. Life Ins. Society Ltd., Yasuda Fire & Marine Ins. Co. (U.K.), Mentor (U.K.), Turegum Ins. Co.

Anthony J. Piazza, Jr., Scranton, PA, M. Elizabeth Medaglia, Jackson and Campbell, P.C., Richard S. Kuhl, Jackson & Campbell, P.C., Washington, DC, for defendant Nat. Union Fire Ins. Co. of Pittsburgh, PA.

Charles W. Rubendall, II, Keefer, Wood, Allen and Rahal, Harrisburg, PA, John H. Suminski, McElroy Deutsch & Mulvaney, Morristown, NJ, for defendant U.S. Fire Ins. Co.

## MEMORANDUM AND ORDER

CONABOY, Chief Judge.

Plaintiff, Gould, Inc., initiated this diversity based action on April 29, 1991, against several Defendant insurance companies seeking coverage and indemnification for the bodily injury claims of Dominick Zaccagnino. (not a party to the present suit). Currently the following motions are pending before the Court: (1) Plaintiff's motion for partial summary judgment; (2) Defendant's, United States Fire Ins. Co., cross-motion for summary judgment; (3) Plaintiff's motion for a Protective Order; and, (4) Defendants' joint motion to compel the production of documents. The Court will review and analyze all of the above motions in the present Memorandum and Order.

1. Defendants maintain that Zaccagnino was never employed by Marjol, but was instead employed as a contract hauler with Mark A. Robin Trucking Company. Defendants contend that Zaccagnino began hauling batteries from various sites, mostly in the Northeastern United States, to Marjol's Throop facility for processing by Marjol employees in 1971. (Doc. No. 129, Exh. B, p. 11 and 27).

2. The Defendants recite a long history of lead emission problems at the Marjol site. For example, in December 1968, the Pennsylvania Department of Environmental Resources (herein-

## FACTS

From approximately 1964 through May 1980, Marjol Battery & Equipment Company (hereinafter Marjol) operated a battery crushing and lead processing facility on Delaware Street in Throop, Pennsylvania. Marjol was wholly owned by Lawrence E. Fiegleman. In May 1980, Plaintiff Gould, a corporation engaged in the business of electronics, purchased the Marjol property and assets from Mr. Fiegleman. After its purchase, however, Gould discontinued the lead processing operation and used the site solely for battery crushing and as a transfer point at which to accumulate batteries for transportation to other Gould facilities. (Doc. No. 86, p. 7). In approximately 1982, Gould ceased all operations at the Marjol site.

In February 1989, Dominick and Elizabeth Zaccagnino filed suit against Gould, claiming that Mr. Zaccagnino suffered bodily injury as a result of alleged exposure to lead in the course of performing services at the Throop site. Mr. Zaccagnino was a self-employed truck driver for an independent trucking company.[1] (Doc. No. 107, Exh. B, pp. 3–4).

Plaintiff Gould notified Defendant CNA, its primary insurance carrier, of the claims made by Zaccagnino and demanded that it provide a defense to Gould and indemnify Gould for all losses, damages, costs, and expenses incurred in the investigation, defense, and resolution of the lawsuit. (Doc. No. 86, p. 13). Defendant CNA, however, informed Gould that coverage is excluded because the claims arise out of environmental pollution which was not "sudden and accidental but gradual and ongoing from 1968 to the present."[2] (Doc. No. 107, Exh.

after PADER) found that "uncontrolled lead emission sources at the Marjol Site were responsible for significant dispersals of lead in the air around the facility." (Doc. No. 129, p. 2). As a result of these findings, PADER ordered Marjol to install control equipment to reduce lead emissions into the atmosphere by November 1, 1970. Id. In 1971 and 1972, however, the PADER determined that Marjol had not complied with the mandated lead emissions control efforts. Id. As a result, the PADER requested Marjol to discontinue smelting operations in June 1975.

D, p. 3). Gould then notified the other Defendant insurance carriers of the Zaccagnino's claims and made similar demands of them. The remaining Defendant insurance companies likewise refused Gould's requests for coverage and indemnification.

On January 3, 1991, Plaintiff Gould settled with the Zaccagnino's for an amount which this Court ordered confidential, except as necessary for Gould to assert a claim against its insurers. Plaintiff Gould notified the Defendant companies of the settlement. (Doc. No. 86, p. 13).

As a result of the Defendant insurance companies refusal to provide coverage and indemnification to Gould, Plaintiff Gould filed the present lawsuit in the District Court. Plaintiff Gould seeks the "full amount that it has been required to pay to date in connection with the Zaccagnino lawsuit, plus the costs and counsel fees it has incurred in pursuing its rights in the coverage dispute with the companies, including this action." (Doc. No. 86, pp. 14–15).

## I

## CHOICE OF LAW

Initially, the Court is confronted with a choice of law issue, between the law of Pennsylvania, where among other things, the injuries resulting in the claim for which Gould seeks coverage occurred, and the law of Illinois, where Gould contends the policies issued to Gould were delivered and from where premium for such policies allegedly was paid. (Doc. No. 129, p. 12 n. 8). Although some of the remaining Defendants have places of business outside Illinois and Pennsylvania, those parties do not argue that the law of those states should be applied in the present action. As Courts generally decide only those issues raised by the parties, *Winston v. Children & Youth Services*, 948 F.2d 1380, 1385 (3d Cir.1991); *Beaver Valley Power Co. v. Na-*

*tional Eng'g & Contracting Co.*, 883 F.2d 1210, 1217 n. 6 (3d Cir.1989), we accordingly confine our analysis to the question of whether Illinois rather than Pennsylvania law should govern.

Since this is a diversity case filed in the Middle District of Pennsylvania, we must apply Pennsylvania choice-of-law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Armotek Industries v. Employers Insurance of Wausau*, 952 F.2d 756, 760 (3d Cir.1991). For a long time Pennsylvania was among those jurisdictions applying a "stiff" approach to determining the appropriate law to apply in a given case. So that in a tort case, the place of the injury (*lex loci delicti*) rule was followed, and in a contract matter the case was governed by the law of the state where the contract was made.

More recent opinion, however, is that these rules should be changed in favor of a more flexible rule which permits an analysis of the policies and interests underlying the particular issue before the Court. This approach has been described as more logical because "the merit of such a rule is that it gives the place having the most interest in the problem paramount control over legal issues arising out a particular factual context and thereby allows the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation." *Jewelcor Incorporated v. St. Paul Fire & Marine Insurance Company*, 499 F.Supp. 39, 41 (M.D.Pa.1980) (Conaboy, J.) (quoting *Babcock v. Jackson*, 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963)). *See also Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1313 (3d Cir.1978).

Indeed, this case is a classic example of the need to move away from a plastic or

---

At the same time the PADER was involved with Marjol, the United States Occupational Safety and Health Administration (hereinafter OSHA) also identified and documented violations of environmental standards. Official investigative reports from OSHA outline the continual violations, stating:

"The conditions parallel these old state reports and indicated a lack of reasonable effort to eliminate the hazard ... This is considered a flagrant and conscientious flaunting of the Act." (Doc. No. 129, p. 6).

"The attitude exhibited ... with regard to employee health and safety can only be characterized as intentional disregard." *Id.*

stiff approach whereby the choice of laws would be determined by either the place of injury or the place of the contract. In this day and age it is common to find lawsuits between people or corporations who in fact do business in many states all across the Nation. It is therefore more necessary to look to that jurisdiction which has more contacts with and more interest in the matter at issue rather than any static application of antiquated laws.

While the contract between the Plaintiff and some of the Defendants was formed in Illinois, the Plaintiff's substantial business enterprise was in Throop, Pennsylvania, and the subject of the underlying lawsuit is entirely located in Throop, Pennsylvania. Additionally we find that the Commonwealth of Pennsylvania has a very substantial interest in protecting the rights of its corporate entities, as well as those with whom they do business. The Defendant companies in this case chose to do business within the confines of the Commonwealth of Pennsylvania, and the business of insuring against environmental pollution is one in which the Commonwealth has a very distinct interest.

Moreover, the Court notes that neither party has taken a firm position as to which law should apply. All parties, including the Plaintiff, cite and analyze, for the most part, Pennsylvania law. In light of this fact, as well as the Commonwealth's substantial interest in this case, the Court is convinced that Pennsylvania rather than Illinois law should be applied. We will therefore consider the pertinent policy provisions as construed under Pennsylvania law.

## II

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Gould filed a motion for partial summary judgment on March 3, 1992, claiming that the insurance contracts between Gould and the various Defendants specifically cover bodily injury claims caused by continuous or repeated exposure to conditions. (Doc. No. 107 and Doc. No. 108, p. 5). Plaintiff bases its position on the following two contentions: (1) the pollution exclusion clauses contained in the insurance policies between Gould and the Defendants are meant to preclude coverage for *environmental* pollution—*i.e.*, pollution that extends *beyond* the source of the pollution (here, the worksite); and (2) even assuming that the language of the pollution exclusion is not clear, then, under well-established principles of insurance policy interpretation, the ambiguity should be construed against the Defendant insurance companies in order to provide coverage to Gould for the Zaccagnino's claims. (Doc. No. 108, p. 6). (emphasis in original)

The Defendants object to Plaintiff's motion on several grounds, the first being the contention that Plaintiff's motion is improper in that Plaintiff Gould is not a party "seeking to recover upon a claim, counterclaim or cross-claim" or even "to obtain a declaratory judgment" on its own claim. Rather, the Defendants contend, Plaintiff is a party seeking to dispose prematurely of a defense to its claim by moving for summary judgment before discovery has been completed and before Gould has proven the elements of the case to which the defense might be interposed. (Doc. No. 129, p. 12).

The Defendants also argue that the language of the exclusion clause means a claim that was otherwise covered (including a claim involving a "continuous or repeated exposure to conditions") will not be covered if the coverage sought is for bodily injury (or property damage) suffered as a result of the "discharge, dispersal, release or escape" of "contaminants" or "pollutants" upon land, into the atmosphere, or into the waster, unless that "discharge, dispersal, release or escape" is "sudden and accidental". (Doc. No. 129, p. 22). Therefore, the Defendants contend that a claim involving a "continuous or repeated exposure to conditions" may be either covered or not, depending upon, among other things, whether the pollution exclusion applies. (Doc. No. 129, p. 22).

Lastly, the Defendants maintain that the exclusion provisions contained in their re-

spective insurance policies are not ambiguous. (Doc. No. 129, p. 22).

### A. The Appropriateness of Plaintiff's Motion For Partial Summary Judgment.

■ As to the Defendants initial objection regarding the appropriateness of Plaintiff's motion for summary judgment, the Defendants are correct in that summary judgement in favor of a claimant is appropriate only when he seeks "to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment." Fed. R.Civ.P. 56(a). Therefore, summary judgment would not be proper in this instance because Plaintiff's motion addresses potential defenses as opposed to a presentation of its own claims. See Abyaneh v. Merchants Bank, North, 670 F.Supp. 1298 (M.D.Pa.1987) (Nealon, C.J.).

■ The Court will, however, construe Plaintiff's motion as a request to rule on the availability of the defenses raised by the Defendants in their answers. Id. at 1300.

### B. The Meaning of the Pollution Exclusion Clause.

■ The Court must next address the meaning of the standard pollution exclusion clause's exception for discharges that are "sudden and accidental."

The pollution exclusion clauses contained in the Defendants' policies, for the most part, read as follows: [3]

This insurance does not apply:

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but [t]his exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental. (Doc. No. 107, Exh. F).

The Plaintiff interprets the above exclusion to deny coverage only for those claims that involve "widespread pollution of the environment beyond the source of the pollution." (Doc. No. 108, p. 6). Gould's principal authority for the existence of this "worksite exception" to the contamination or pollution exclusion's applicability is a decision by Judge Abraham Gafni, Philadelphia Common Pleas Court Judge, in the case of Gould, Inc. v. Continental Casualty Company, No. 3529, June Term 1986 (C.P.Phila.). In Continental Casualty, Judge Gafni stated that the contamination or pollution exclusion is, in his opinion, "designed to apply to occurrences outside the workplace."

The Defendants argue that the factual premise in Gould, Inc. v. Continental Casualty, is distinctly different from the case at bar, in that the worksite exposure in Continental Casualty occurred at least in part indoors and involved a number of employees who worked only nominally in the outdoors. Furthermore, the Defendants contend that the claimants overexposure to lead and other harmful metals in Continental Casualty was the result of daily exposure to such substances while performing manufacturing operations at the plant. (Doc. No. 129, p. 35 and Doc. No., p. 24.). Zaccagnino, Defendants claim, was exposed to lead only after it was dis-

---

**3.** The pollution exclusion in Defendant Lloyd's excess policy contains slightly different language from that contained in the underlying comprehensive general liability policies. The Lloyd's policy states:

This insurance does not cover any liability for: (1) Personal Injury or Bodily Injury ... directly or indirectly caused by seepage, pollution or contamination, provided always that Paragraph (1) shall not apply to liability for Personal Injury or Bodily Injury ... where such seepage, pollution or contamination is caused by a sudden, unintended and unex-

pected happening during the period of this Insurance.

Court's interpreting the above provision, however, have held that there is "no meaningful difference" between the wording in the pollution exclusion clause contained in the comprehensive general liability policies and that in the Lloyd's excess policy, and we agree. Olin Corp. v. Insurance Co. of North America, 762 F.Supp. 548, 563 (S.D.N.Y.1991); Time Oil Co. v. CIGNA Property & Cas. Ins. Co., 743 F.Supp. 1400, 1407–08 (W.D.Wash.1990).

charged or dispersed into the atmosphere around the Marjol plant and settled onto the "land".

Clearly, the factual premise in *Gould, Inc. v. Continental Casualty* is different from the present case. As the Defendants point out, the issue before Judge Gafni was whether the pollution exclusion clause acted to bar coverage for work-related employee claims arising out of exposure to toxic substances within the plant itself [4], and not whether the release of those substances into the atmosphere around the plant triggered the pollution exclusion clause.

A case that is applicable to the present situation is the more recent case of *Northern Ins. Co. v. Aardvark Associates*, 942 F.2d 189 (3d Cir.1991), wherein the Third Circuit reviewed a similar pollution exclusion clause to determine its proper interpretation. In that case, Northern (the insurer) brought suit seeking a declaratory judgement that it was not required to provide a defense for CERCLA claims brought against Aardvark (the insured), an industrial waste hauler engaged in the business of transporting drums of industrial waste from one site to another. *Id.* at 190–191. The Court granted Northern's motion for summary judgment, noting "that the exception for 'sudden and accidental' discharges applies only to discharges that are abrupt and last a short time ... unlike the pollution at issue [which was] gradual, stretching over several years and many shipments of waste." *Id.* at 191–193.

Clearly, the Court in *Northern* focused on whether the pollution was "sudden and accidental", as opposed to whether the pollution was contained within the four walls of the operating plant. We find this approach to be more logical and one that centers on the clear meaning of the pollution exclusion clause.

In an effort to establish the worksite exception to the pollution exclusion, the Plaintiff cites some non-binding authority from other circuits. For example, Plaintiff cites *Consolidated American Insurance Co. v. Ivey's Steel Erectors, Inc.*, No. 90–205 (M.D.Fla. March 12, 1991), wherein a Florida District Court granted the insured's cross-motion for summary judgement. In *Ivey's*, various employees of Ivey Steel Erectors, Inc., brought a state civil action claiming damages for injuries incurred as a result of exposure to toxic levels of lead resulting from welding and burning on structural steel which had been painted with a lead-based paint. The employees alleged that Wade A. Ivey was grossly negligent in failing to provide the employees with safety equipment or to warn them of the dangerous working conditions existing at the job site. *Id.* at 2. Ivey argued that coverage is not precluded by the pollution exclusion clause because the complaint is not premised upon the release of toxins but rather on the negligence of Ivey in failing to provide the injured employees with adequate safety equipment or notice of the dangerous conditions. *Id.* at 3. After reviewing the pollution exclusion clause and the Defendant's arguments, the Court held that the pollution exclusion clause was ambiguous. The Court noted, "it is unclear whether the pollution exclusion clause was intended to apply to dangerous work environments where the conditions within the work area may be toxic but once disbursed into the atmosphere the smoke, fumes or vapors do not reach a toxic level." *Id.* at 5.

While this case may provide some insight into the issue, one can argue, as the Defendants do, that it is factually distinguishable. No one in the present case has suggested that the lead was contained only within the walls of the Gould plant. Instead, it is well-known that lead emissions were contaminating the surrounding area of the Gould plant for miles. *Supra* note 2, at 3. Furthermore, Domenick Zaccagnino was allegedly not employed by Gould, but instead was employed by a independent trucking company hired to haul waste from the Gould plant.

---

**4.** The Court makes no determination as to the validity of Judge Gafni's interpretation of the pollution exclusion clause's applicability to such employee related work-site claims, as that issue is not presently before this Court.

The Plaintiff also cites *National Standard Ins. Co. v. Continental Ins. Co.,* No. 81–1015 (N.D.Tex. October 4, 1983), claiming that the United States District Court for the Northern District of Texas embraced the "worksite exception". In *National,* claimants who were either employed by Texas Butadine, a chemical company, or were employed by another company in the vicinity of Texas Butadine, alleged they were exposed to chemical carcinogens. After the claimants brought suit against Texas Butadine, the insurance companies sought a declaratory judgment that they were not required to defend or indemnify Texas Butadine in the underlying suit. The District Court, interpreting a similar pollution exclusion, noted:

> The pollution exclusion is designed to exclude coverage of non-accidental environmental pollution ... The pollution exclusion is only relevant to claims of injury based on exposure to chemical carcinogens in the ambient atmosphere. This Court is of the opinion that the exclusion would not apply to exposure to ... chemicals in an enclosed working environment. For this reason, this exclusion would not by itself serve to exclude possible coverage of the claims brought by the claimants who were employees either of Texaco Butadiene or *any of the companies in the Port Neches area. Id.* at 10. (emphasis added).

Although this case speaks more specifically about the "worksite exception" and encompasses individuals who were not employees of Texas Butadine, the Court finds this case to be inapposite. First, Zaccagnino was not working in an enclosed working environment at the time of his alleged exposure to lead emissions. Instead, Zaccagnino's exposure occurred only after the lead emissions were released into the atmosphere and dispersed onto the land. Second, Pennsylvania Courts clearly focus on the "sudden and accidental" portion of the pollution exclusion provision and do not discuss whether the pollution occurred within an enclosed working environment. We see no reason why this Court should not follow the same philosophy and pat-

tern, indeed, it is our finding that we are bound to do so.

Accordingly, based on the facts presented in this case, we reject the Plaintiff's contention that a worksite exception to the pollution exclusion exists.

### C. *Ambiguity In the Pollution Exclusion Clause.*

■ The Plaintiff next argues that if the Court decides that coverage is not clear from the insurance policies, then, under well-established principles of insurance policy interpretation, the ambiguity should be construed against the Defendant insurance companies in order to provide coverage to Gould for the Zaccagnino's claims. (Doc. No. 108, p. 6). (emphasis in original)

The primary analysis adopted by those Court's which have found the pollution exclusion ambiguous, and which is urged on us by the Plaintiff, is that an ambiguity appears when the "sudden and accidental" exception to the exclusion is read in the context of the definition of a covered "occurrence." The alleged ambiguity arises from the fact that the basic requirement for coverage is the existence of an occurrence as the event that causes the claimed damages. The policies define occurrence as "an accident, including a continuous or repeated exposure to conditions which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Thus, an occurrence can occur gradually, as opposed to suddenly. The pollution exclusion, on the other hand, provides a separate specific requirement for coverage of damages resulting from pollution. It provides that all such coverage is excluded unless the polluting event giving rise to the damage is "sudden and accidental." Courts finding the pollution exclusion ambiguous have opined that the juxtaposition of these two coverage requirements, i.e. the general requirement of an occurrence, which can be gradual, and the specific requirement applicable to a release of pollutants, which must be sudden, creates confusion in the policy.

Because this is a diversity case, we must look to the state substantive law, in this

instance the law of Pennsylvania for guidance on the issue. Although the Supreme Court of Pennsylvania has not addressed the question before us, the Superior Court has twice done so.[5] In *Techalloy Co., Inc. v. Reliance Insurance Co.*, 338 Pa.Super. 1, 487 A.2d 820 (1984), the insured (Techalloy) had been sued for allegedly recklessly dumping or storing Trichloroetheline, which allegedly caused severe injury to the Plaintiff class. The insurer (Reliance) refused to defend the action relying on the standard pollution exclusion clause's exception for "sudden and accidental" discharges. In reviewing the pollution exclusion clause, the Court applied its plain meaning and ruled that the clause was not ambiguous and that the insured's lengthy history of toxic discharges on a "regular or sporadic basis from time to time during the past 25 years" could not be viewed as "sudden". 338 Pa.Super. at 11–15, 487 A.2d at 826–827. The Supreme Court of Pennsylvania denied review. 338 E.D. Allocatur Dkt. 1985 (Pa. Oct. 31, 1985).

The Superior Court discussed the same issue at greater length in *Lower Paxton Township v. U.S. Fid. and Guar. Co.*, 383 Pa.Super. 558, 557 A.2d 393 (1989), where the Court held that a township's insurance policy, containing the same standard pollution exclusion clause as the one in the present case, did not cover claims based on the release of methane gas from a municipal landfill. Like Plaintiff Gould, the township argued that the phrase "sudden and accidental" is ambiguous and should be construed to mean unexpected or unintended. 383 Pa.Super. at 568, 557 A.2d at 398. In *Lower Paxton* the Court addressed the argument as follows:

> To read "sudden and accidental" to mean only unexpected and unintended is to rewrite the policy by excluding one important pollution coverage requirement— abruptness of the pollution discharge. The very use of the words "sudden *and*

accidental" (emphasis added) reveal a clear intent to define the words differently, stating two separate requirements.

Clearly, the Pennsylvania Courts have no difficulty reconciling the two provisions:

> [W]e believe the "occurrence" definition results in a policy that provides coverage for continuous or repeated exposure to conditions causing damage in all cases except those involving pollution, where coverage is limited to those situations where the discharge was "sudden and accidental." *Lower Paxton*, 557 A.2d at 402.

Furthermore, the interpretation utilized in *Techalloy* and confirmed in *Lower Paxton* has consistently been followed by the District Courts in both the eastern and western districts of Pennsylvania. *See Centennial Insurance Company v. Lumbermens Mutual Casualty Company*, 677 F.Supp. 342 (E.D.Pa.1987); *Mutual Liability Insurance Company v. Neville Chemical Company*, 650 F.Supp. 929 (W.D.Pa. 1987); *Fischer & Porter Company v. Liberty Mutual Insurance Company*, 656 F.Supp. 132 (E.D.Pa.1986).

Plaintiff understandably relies on another recent case, *New Castle County v. Hartford Accident and Indemnity Co.*, 933 F.2d 1162 (3d Cir.1991), wherein the Third Circuit decided that the pollution exclusion provisions at issue were ambiguous. In *New Castle County*, however, the Third Circuit reached its decision by predicting how the Delaware Supreme Court would react to the ambiguous terms argument. That prediction, however, can not control in the present case, as there is strong guidance to the contrary in the decisions from the Superior Court of Pennsylvania. *See New Castle County v. Hartford Accident and Indemnity Company*, 970 F.2d 1267, 1273 (3d Cir.1992). (Third Circuit explained this paradox by noting that the conclusion in the *Northern* case was predicted on decisions of the Pennsylvania Superior

---

5. Although this Court is not bound in a diversity case to follow decisions of a state intermediate appellate court, we are instructed that such decisions are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would

decide otherwise." *Northern Ins. Co. v. Aardvark Associates*, 942 F.2d 189, 193 (3d Cir.1991) (quoting *Commercial Union Ins. Co. v. Bituminous Casualty Co.*, 851 F.2d 98, 100 (3d Cir. 1988)).

Court and the New Castle case was decided without any specific guidance from Delaware case law).

The parties to these insurance contracts are both large corporate entities who have available to them the expertise and guidance necessary to be certain that the contracts they enter into reflect their actual intent and understanding. There is no indication here that one side or the other had an advantage in forcing an undesired agreement. We are instructed, too, repeatedly not to use the ambiguity argument as a vehicle for rewriting contracts freely entered into by the parties. Rather, we should take this argument in the context in which the parties found themselves at the time they entered into the contracts, as well as the overall intention the parties demonstrated by reference to the entire contract. A simple common sense reading of the wording of the policy involved reveals no ambiguity and, indeed, reveals a clear determination to make a distinction between events which happen suddenly and accidentally and those which continue over a long period of time.

Therefore, like the numerous decisions from the both Superior Court of Pennsylvania and the Third Circuit, we reject the Plaintiff's argument that the pollution exclusion clauses are ambiguous.

### III

### DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

Having addressed the meaning of the pollution exclusion clause and its exception, we turn to the question of whether summary judgment in favor of United States Fire Insurance Company is proper. Defendant United States Fire Insurance Company filed a cross-motion for summary judgment on April 16, 1992, alleging basically what the other Defendants do, to wit; (1) the pollution exclusion clause precludes coverage; and (2) the clause is not ambiguous. (Doc. No. 122). Defendant United States Fire, however, also contends that it issued Gould "excess policies" which do not become effective until the primary policies have been exhausted.

Rule 56(c) of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Accordingly, we must determine which party bears the burden of proving an exception to the pollution exclusion.

■ Again referring to state substantive law for guidance, the Court finds that the insured bears the burden of proving that a discharge was "sudden and accidental." *See Northern Ins. Co. v. Aardvark Associates*, 942 F.2d 189 (3d Cir.1991) (interpreting *Lower Paxton Township v. U.S. Fid. and Guar. Co.*, 383 Pa.Super. 558, 557 A.2d 393 (1989) and *Techalloy Co., Inc. v. Reliance Insurance Co.*, 338 Pa.Super. 1, 487 A.2d 820 (1984).

■ Applying this standard to the present case, it is clear that Zaccagnino's claims were based on pollution and thus fell within the policies' general exclusion. In order to avoid summary judgment, therefore, Plaintiff was required to show that the Zaccagnino's claims were based on "sudden and accidental" discharges. Plaintiff failed to establish this. To the contrary, as clearly established and discussed in Part II of this Memorandum and Order, it is undisputed that the discharges occurred on a continual basis over several years. Thus, Plaintiff failed to make the necessary showing that the discharges were "sudden and accidental." Accordingly, Defendant Union Fire's motion for summary judgment is granted.

### IV

### PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER

On September 17, 1991, Plaintiff Gould filed a motion for a Protective Order seeking an order limiting the number of interrogatories to forty (40) to which it must respond. (Doc. No. 61). Plaintiff asserts that the various Defendants have served

Gould with 137 interrogatories, in violation of Local Rule 402.8, which provides in relevant part:

Interrogatories or requests for admissions to a party, as a matter of right, shall not exceed forty (40) in number.

Plaintiff contends that pursuant to Local Rule 402.8, the combined Defendants may serve on the Plaintiff a total of forty (40) interrogatories. (Doc. No. 62).

The Defendants respond by arguing that *each* Defendant is permitted to propound forty (40) interrogatories on the Plaintiff. (Doc. No. 62, Exh. B). The Defendants maintain that under the Plaintiff's interpretation, "an action by one Plaintiff against 40 defendants would allow each defendant only one interrogatory, and, if there were eighty defendants, each would get only half a question." *Id.*

Subsequent to the filing of the above motion, a hearing was held on August 13, 1992 to discuss the pending motions in this case. At that time the parties entered into an agreement as to the number of interrogatories that would be propounded by the Defendants. Accordingly, the above motion is dismissed as moot.

## V

## DEFENDANTS' JOINT MOTION TO COMPEL PLAINTIFF'S RESPONSE TO PRODUCTION OF DOCUMENTS

The next discovery motion pending before the Court is a joint motion of the Defendants filed on March 13, 1992, to compel Plaintiff's response to requests for production of documents. (Doc. No. 104). In light of the fact that the Plaintiff has already produced seven (7) boxes of information in response to the Defendants requests and negotiations are continuing between the parties, only a few matters need to be addressed by the Court. (Doc. No. 124, p. 1). The documents still the subject of the motion are as follows: (a) documents relating to off-site contamination; (b) documents concerning post–1980 events; (c) information and documents concerning Gould's post–1980 knowledge of the health

risks associated with lead exposure; (d) documents relating to Gould's procedures for handling lead at other sites; and (e) all correspondences between Gould and Lawrence Fiegleman. (Doc. No. 124). After carefully reviewing the Defendants' motion and the Plaintiff's response, the Defendants' motion will be granted in part and denied in part.

### A. *Off–Site Contamination.*

 As to the Defendants' request for documents relating to off-site contamination, the Defendants indicate that they would like answers to Request Nos. 3–6, 53, 54, 62, 63, and 85. (Doc. No. 109, p. 6). Basically, the documents sought contain either information concerning the underlying lawsuit and related actions or advice from attorney's and experts in the underlying lawsuits. For example, Request No. 3 [6], seeks the following information:

3. All pleadings and/or other documents filed or issued in the underlying actions or related actions, including all documents produced or received in discovery in such actions, and the official record of any adjudicatory or evidentiary hearing.

The Plaintiff objects to the request, noting:

3–5. Gould objects to this request to the extent that it calls for production of documents in actions other than *DeLeo v. Marjol Battery & Equipment Co., et al.*, No. 80–3823 (C.P. Lackawanna Cy.), since such actions are irrelevant to this litigation, and accordingly this request is not reasonably calculated to lead to discovery of admissible evidence. In addition, certain documents in the Zaccagnino litigation are subject to a nondisclosure Order entered in that case; those documents will be produced only after entry of an appropriate protective order in this case. Subject to these qualifications and objections, see response to Request No. 1.

The Defendants insist that this information is relevant to its defense that Marjol

6. Request No. 3 is representative of the information sought in request Nos. 4, 5, and 53.

expected or intended to injure Zaccagnino, arguing "Plaintiff's knowledge of such complaints and its knowledge that its operations were causing off-site contamination is directly relevant to the issue of whether Plaintiff was aware of the injuries that it may have been inflicting on the workers at the site." (Doc. No. 109, p. 8). The Plaintiff contends that "the expected or intended exclusion precludes coverage only if the insured acted with the specific intent to cause some kind of bodily injury or damage." (Doc. No. 113, p. 8). Unintended results of the insured's intended acts, Plaintiff maintains, do not prevent coverage. *Id.*

The Court finds the Plaintiff's arguments to be unpersuasive. The information sought is clearly relevant to the preparation of a defense by the Defendants. Therefore, the Defendants' motion to compel is granted with respect to Request Nos. 3–5 and 53.

As to Request Nos. 62, 63, and 85, the parties entered into a Protective Order, which the Court approved on April 1, 1992. (Doc. No. 114). Therefore, in light of the fact that the Plaintiff has agreed to respond to the above requests, subject to the Protective Order, the Defendants' motion to compel with respect to Doc. Nos. 62, 63, and 85 is dismissed as moot.

 The two remaining requests, Request Nos. 6 and 54, specifically relate to advise given by attorneys or experts in the underlying lawsuit. Clearly, these documents contain privileged information and need not be produced by the Plaintiff. Accordingly, the Defendants' motion to compel is denied as to Request Nos. 6 and 54.

B. *Post–1980 Events.*

 With respect to post–1980 events, Request No. 46[7] seeks:

46. All documents reflecting or relating to claims made by employees, former employees, or contractors against you or Marjol alleging injury due to exposure to lead.

The Plaintiff states that it is willing to produce documents related to claims by workers based on lead exposure, but argues that documents of this nature "after 1980 when Zaccagnino ceased to work at the site cannot possibly be relevant to his claim of exposure to lead from 1972 to 1980. (Doc. No. 113, p. 10). The Court agrees with the Plaintiff in that documents relating to claims after Zaccagnino ceased to work at the Gould site, are irrelevant to the present lawsuit. Therefore, Defendants' motion to compel documents containing post–1980 events is denied.

C. *Post–1980 Knowledge.*

 Plaintiff similarly seeks to limit the Defendants' request for documents related to Gould's procedures for handling lead at other sites. In particular, Request No. 26 reads as follows:

26. All documents reflecting or relating to the health risk and/or other dangers associated with exposure to lead, including, but not limited to, information obtained prior to and concurrent with the issuance of liability insurance policies to you or by Marjol by these defendants.

The Plaintiff states that it is willing to produce only those documents reflecting the health risks of lead exposure which were in Gould's or Marjol's possession at any time from 1964 (when the plant opened) to 1981, shortly after Zaccagnino stopped working at the site. The Court holds that knowledge about health risks, etc., after 1981 is irrelevant to the present lawsuit and the Defendants' motion to compel such information is denied.

D. *Procedures Utilized at Other Sites.*

 As to the Defendants request for Gould's procedures for handling lead at other sites, Request No. 39[8], Gould argues

---

7. The Court notes that Request Nos. 48 and 50 seek similar information and are also objected to by the Plaintiff.

8. Request No. 39 reads as follows:

39. All documents reflecting or referring to your or Gould's policies, practices or procedures concerning the disposal, treatment, transportation, storage, hauling, handling, re-

that because Gould bought Marjol in May 1980, only five months before Zaccagnino stopped working there, Gould's procedures for operating other plants in 1975, for example, would have no bearing on what Marjol, a completely independent company, intended to do. (Doc. No. 113, pp. 13–14).

After reviewing both the Defendants' request and the Plaintiff's response, the Court agrees that information concerning Gould's policies at other plants would have no bearing on the present action. Therefore, the Defendants' motion to compel such information is denied.

E. *Correspondences from Lawrence E. Fiegleman.*

 Lastly, with respect to correspondences, Request No. 55 seeks:

55. All correspondences between you and Lawrence E. Fiegleman from January 1, 1964 to the inception of this litigation.

Gould contends that it is willing to provide documents containing information regarding lead contamination and claims at the site. (Doc. No. 113, p. 15). Clearly, the Defendants' are only entitled to correspondences containing information regarding lead contamination and claims at the site, which the Plaintiff is willing to provide. Accordingly, the Defendants' motion to compel is denied.

### CONCLUSION

In summary, we hold that the decisions from both the Pennsylvania Superior Court and the Third Circuit, compel us to reject the Plaintiff's contention that there is a worksite exception to the pollution exclusion clauses at issue in this case. Furthermore, we find that, under Pennsylvania law, the terms sudden and accidental are not ambiguous. While "accidental" connotes "unexpected and unintended," the word "sudden" imports an additional, temporal element, that being "abrupt" and lasting a short time. Accordingly, Plaintiff's motion for partial summary judgment is denied and the Defendant, United States

lease or removal of lead at, near or from any

Fire's motion for summary judgment is granted.

As to the discovery motions, the Plaintiff's motion for a Protective Order is dismissed as moot pursuant to the agreement entered into between the parties. The Defendants' joint motion to compel the production of documents is granted in part and denied in part.

This Memorandum and Order disposes of Documents Numbered 66, 104, 107, and 122. The Clerk of the Court is directed to mark the docket sheet accordingly.

An appropriate Order is attached.

### ORDER

AND NOW, THIS 28th DAY OF AUGUST, 1992, IT IS HEREBY ORDERED AS FOLLOWS:

1. The Plaintiff's motion for partial summary judgment in DENIED. (Doc. No. 107).

2. The Defendant's cross-motion for summary judgment is GRANTED. (Doc. No. 122).

3. The Plaintiff's motion for a Protective Order is dismissed as moot. (Doc. No. 61).

4. The Defendants' joint motion to compel is GRANTED IN PART AND DENIED IN PART. (Doc. No. 104).

5. This Memorandum and Order disposes of Documents Numbered 61, 104, 107, and 122. The Clerk of the Court is directed to mark the docket sheet accordingly.